## No. 20,109.

The National Cash Register Company *v.*
Fred P. Lightner.
(388 P. [2d] 781)

Decided January 27, 1964.

Messrs. GRANT, SHAFROTH, TOLL and MCHENDRIE, Mr. ANSEL H. WILSON, for plaintiff in error.

Messrs. DICKERSON, MORRISSEY & DWYER, Mr. W. H. ERICKSON, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE PRINGLE.

WE will refer to the parties as they appeared in the trial court, where the plaintiff in error was defendant and defendant in error was plaintiff.

Plaintiff Lightner was employed by defendant as a salesman for approximately eighteen years, towards the

end of which time he held the position of an accounting machine territory sales manager. The terms of his employment with the defendant were governed by a written contract which contained express provisions relating to the manner in which his compensation was determined. He resigned from the company on October 31, 1958.

In his complaint, plaintiff alleged that upon the termination of his employment he was entitled to receive the sum of $32,844.96 as commissions on products sold by him but not delivered as of the date of his resignation; that said products had subsequently been delivered; and that the defendant had paid $10,489.84 to plaintiff, leaving a balance of $22,355.12 due him for which amount judgment was demanded.

Defendant in its answer denied that it was indebted to the plaintiff in any amount and alleged that upon plaintiff's termination of employment he was entitled to receive only such sums as might thereafter result from credits and charges to his account in accordance with the terms of his contract of employment. Defendant further alleged that all sums due plaintiff at the date of filing of the answer had been paid, although a further sum might thereafter become payable.

Trial was to the court and at the conclusion thereof judgment was entered in plaintiff's favor in the sum of $22,355.12 and the necessity for filing a motion for a new trial was dispensed with.

It is axiomatic that plaintiff's right to recover here depends upon and is limited by the express terms of his written contract with the defendant. It was the plaintiff's burden to prove that the commissions he now claims were earned by him and were due him under the terms of that contract. The sole testimony which he offered in his behalf to sustain this burden was given by himself and consisted of the introduction into evidence of (1) the written contract between the parties; (2) a so-called "split" sheet; and (3) a statement by the plaintiff that to the best of his knowledge the items

listed on the "split" sheet had been delivered and paid for.

The "split" sheet to which we have referred was a document given to the plaintiff at the time of his resignation in accordance with the terms of his written contract which required that he "be provided with a list of the orders secured by you or any salesman working under your supervision, and in which you *may* have a *prospective* commission interest." (Emphasis supplied.)

The "split" sheet in question here showed some 57 orders which had not been delivered at the time of plaintiff's resignation with total prospective commissions of $32,844.96. Each month after the plaintiff left the company's employment he was furnished with a statement of account and paid commissions which had become due him during the previous month. It is clear that the "split" sheet was not an account stated between the parties, but rather an *information* sheet given to the plaintiff in accordance with the terms of the contract showing commissions which would be due plaintiff at some future date, providing the conditions precedent to such liability occurred under the terms of the contract.

At the close of the plaintiff's case, the defendant filed a motion to dismiss on the grounds that plaintiff had failed to prove he was entitled to any of the commissions which he claimed. The motion was denied and the parties then stipulated that the issues should be limited to three disputed transactions reflected in the "split" sheet upon which the plaintiff claimed commissions and upon which the defendant denied he was entitled to any commission at all. The three disputed sales and the commissions which the plaintiff claims thereon are as follows:

| Sale | Commission |
|------|-----------|
| First National Bank of Denver | $12,139.43 |
| Brown Palace Hotel | 1,045.35 |
| American National Bank | 4,168.42 |
| Total | $17,353.20 |

█ The only testimony dealing with the specific conditions under which these three transactions were finally consummated came from the defendant's evidence and were undisputed. We are, therefore, not faced with the problem here of whether the trial court resolved the question properly upon disputed evidence, in which case we would not interfere with the disposition made by the trial court, but whether the trial court as a matter of law properly applied the undisputed evidence to the terms of the contract in question.

We proceed now to analyze the evidence with respect to each of the orders in dispute.

I

*The First National Bank of Denver*

On March 20, 1958, the plaintiff secured an order from the First National Bank of Denver for fifteen accounting machines. This order was a "firm up" of a "blanket order" that had been made some nine months before so as to protect the bank against a price increase. A letter dated March 17, 1958, appears of record wherein the names of the plaintiff and one Greer, defendant's branch manager, are affixed. This letter is addressed to one Ashley, vice president and cashier of the bank, and states that three accounting machines were to be delivered to the bank under the order in question while the remaining twelve machines would not be delivered until the bank had completed a proposed merger and was satisfied that the first three machines "measures (sic) up to your fullest expectations." The letter continues:

"Third, if the savings effected by the installation of the 3 Postronics do not meet with every claim we have made, and if you are not entirely satisfied with the installation, we will not ship the balance of the machines on this order. There will be no further obligations on the part of the First National Bank to the National Cash Register Company.

"The provisions in this letter protects (sic) you on the price of the Postronics and permits (sic) you to save

$846 per machine, and at the same time enables (sic) you to prove to all parties concerned that the Postronics will do the best job possible for your bank."

The first three machines were delivered to the bank and the plaintiff received his full commission thereon. Subsequently, the bank decided to install a computer system and in December 1958 or January 1959, some months after the plaintiff had resigned from the defendant company, the bank, through one of its officers, orally notified Greer that it would not take delivery of the remaining twelve machines. The company continued, however, to try to persuade the bank to take and install the machines which were undelivered. Finally, in a letter dated July 15, 1959, the bank formally cancelled the order.

After the written cancellation, the defendant continued to attempt to interest the bank in using its accounting machines and proposed that it do so at least during the two year interim period before the bank's new computer system was to be installed. The defendant first proposed to rent the machines to the bank, and when this was rejected, it proposed a "buy back" arrangement by the terms of which the bank would purchase the machines subject to its right to compel the defendant to buy them back in the future at a depreciated price. The three machines which had been installed at the bank were sent to Dayton, Ohio, and mechanically altered to better adapt them to the bank's system and the defendant sent specialists to the bank to train the bank's employees in the use of the altered machines and to conduct tests on the system. These efforts were successful and finally culminated in an order by the bank under the "buy back" proposal for sixteen modified accounting machines on November 6, 1959. The price of the modified machines was some $800.00 more per machine than the price of the remaining twelve machines in the order secured by the plaintiff on March 20, 1958. Eight of the machines were installed in the bank on

November 28, 1959, and the remaining eight on January 10, 1960. The bank thereafter continued with its plan to install a computer system and put the same into effect in August 1961. In the same month, the bank exercised its option to sell the accounting machines back to the defendant and at the time of the trial of this cause the defendant had repurchased them from the bank.

The trial court held that the plaintiff was entitled to a commission on this sale, determining that the events above described resulted in a "continuous transaction." In our view, the express terms of the plaintiff's contract of employment with the defendant prevent his recovery of the commission on this sale.

*First,* the undisputed facts show that the machines were not delivered pursuant to the order obtained by the plaintiff, but rather on different terms and conditions agreed to by the bank and the defendant after cancellation of the original order and after prolonged negotiations. Under such circumstances, the following contract provision is applicable:

"(3) *Protected Sales* are sales made by you or your predecessor in your Territory which are cancelled and you or your successor secure a new order within three months from the date of the notice of cancellation. In such cases the salesman making the original sale shall be protected and shall receive the commission credit on the second sale up to the amount of the commission credit on the original sale, subject to the provisions of sub-paragraph B.1. of Section III hereof. Only the commission credit in excess of such amount shall be given the selling salesman on the new order."

More than three months elapsed between the date of cancellation — July 15, 1959 — and the date of the new order — November 6, 1959 — and the original sale was therefore not a protected one.

Plaintiff contends also that the cancellation by the bank was not an effective one because, in his view, the bank had no right to cancel. He makes this claim in

spite of the letter signed by him agreeing that the bank would not be required to take the remaining twelve machines if they were not satisfied. But even if the bank had no legal right to cancel the order, the plaintiff has no right to the commission under the circumstances of this case because the contract of employment between plaintiff and defendant provides that plaintiff's right to a commission is terminated if there is a cancellation and there is no provision in the contract requiring that such cancellation be for cause. In fact, plaintiff readily admitted in his testimony that if there had been a cancellation here and no delivery had been made at all he would not be entitled to a commission under his contract. If this be so, he cannot now contend that under his contract the defendant was required to insist on delivery under the *original* contract and that a failure to so insist gives him the right to a commission.

Second, if the machines installed in November 1959 and January 1960 be considered as having been delivered under the original order secured by the plaintiff on March 20, 1958, the following contract provision is pertinent:

"c. Notwithstanding the generality of sub-paragraphs d, e, and f hereof, your commission interest in any order by way of either Territory or Seller's Commission, as the case may be, shall terminate upon any of the following events:

"(1) If shipment of the order is not made within eighteen months from the date of the order unless the Territory *is* assigned to you for coverage at the date of delivery and installation * * * ."

This provision accounts for the statement that appears at the head of the "split" sheet:

"This list has been prepared assuming the shipment of the products will be made within 18 months from the date of the order or confirmation * * * ."

It is undisputed that shipment and installation of this order did not occur until more than eighteen months

after the plaintiff secured the original order — this at a time when the territory was not assigned to the plaintiff, he having resigned from the company on October 31, 1958.

■ It is readily apparent that the plaintiff cannot recover whether the delivery was considered as having taken place under the original order or as a result of a new order on November 6, 1959. If we adopt the finding of the trial court that the delivery was made under the order of March 20, 1958, the terms of the second provision of the contract above recited are applicable and the plaintiff cannot recover because more than eighteen months elapsed from the date of the order to the date of shipment and installation and did not occur while the territory was assigned to the plaintiff. If we consider the order of November 6, 1959, as a new order, the plaintiff cannot bring himself within the "protected sales" provision since more than three months elapsed between the date of the new order and the date of the cancellation.

The trial court overlooked these key provisions of the contract of employment. The plaintiff attacks these provisions as "loopholes," but, if they are, they are expressly provided for by the contract and we are not apprised of any theory which would dictate their exclusion from the case.

II

*The Brown Palace Hotel*

On June 28, 1957, the plaintiff and one Schmitz, a salesman working under plaintiff, obtained an order from the Brown Palace Hotel for one accounting machine. This machine was shipped from Dayton, Ohio, on March 13, 1958, and arrived in Denver approximately five days thereafter. The Brown Palace Hotel paid for the machine on May 5, 1958, but did not take delivery because the Brown Palace Hotel West, an annex within which the machine was to be installed, had not yet

opened. The machine was stored in defendant's branch office until installed on November 28, 1958.

The plaintiff received a 7½% seller's commission on this sale, or approximately $455.00. David N. Baptie, who at the time was defendant's office manager in Denver, testified that the plaintiff was entitled to a commission of $1,393.80 as of the date of the sale but that he did not receive the balance because he was not covering the territory when the machine was finally delivered and installed. The balance of the commission ultimately was paid to another salesman who was in charge of the territory at the time that the machine was finally installed.

The defendant relies upon the following provision in the contract of employment to defeat the plaintiff's claim to a full commission on this sale:

"c. *Transfer Sales, Exchange Transfers, and Protected Sales*.

"(1) *Transfer Sales* are sales where the product sold is transferred outside or into your Territory within six months from the date of shipment if a shipment order, or from the date of delivery if delivered from branch consignment. If the product is transferred outside your Territory within such period and your Account has been credited with Territory Commission thereon, such commission credits shall be reversed, except that if the original sale was classified as a Personal Sale, your Account shall be credited with the Seller's Commission thereon as an Inter-Branch or Intra-Branch Sale (as the case may be). When the product sold is transferred into your Territory within such period your Account shall be credited with Territory Commission thereon above provided dependent upon the classification of the sale. The foregoing provision shall likewise apply to successive transfers within such six month period; however, the location of the product sold as of the end of such six month period shall determine the distribution of commission credits regardless of the length of time

in such location. The provisions of this subparagraph (1) shall apply regardless of any change in ownership of the product.

"In the event the product sold is not placed in use after full settlement, or the product is removed from active use within six months from the date of shipment or delivery from consignment (as the case may be) and your Account has been credited with Territory Commission such credit shall be reversed, except that if the sale was a Personal Sale your Account shall be credited with Seller's Commission thereon as an Intra-Branch or Inter-Branch Sale. *When such product is removed from storage and is placed in actual use such commission shall be recredited provided such use occurs in your Territory at a time when it is assigned to you.*" (Emphasis supplied.)

The defendant reasons that since the territory was no longer assigned to the plaintiff when the machine was finally installed, the plaintiff was not entitled to his territorial commission on the sale. With this we do not agree. The provisions relating to commissions on items put into storage and subsequently installed are placed, structurally, within that section of the contract dealing specifically with "Transfer Sales." The defendant does not assert that the sale to the Brown Palace Hotel was, in fact, a "Transfer Sale," but urges that the provisions relating to the storage and subsequent installation of items within that category be given a broader application so as to govern the sale in question.

We cannot construe the contract in the manner contended for by the defendant. We think it is clear upon reading the sections here involved that the provisions relating to storage refer only to "Transfer Sales" which are defined by the contract. The sale to the Brown Palace Hotel is not, in our opinion, within that contract definition of a "Transfer Sale." But if there exists any ambiguity as to what transactions are covered by the provisions in question here, those provisions

must be interpreted most strongly against the party drawing the contract, in this case the employer-defendant. *Six Star Lubricants Co. v. Morehouse,* 101 Colo. 491, 74 P. (2d) 1239; *Gardner v. City of Englewood,* 131 Colo. 210, 282 P. (2d) 1084; *Lembke Plumbing and Heating v. Hayutin,* 148 Colo. 334, 366 P. (2d) 673.

■ We conclude that the fact that this machine was placed in storage in Denver as an accommodation to the consignee, who was not ready for delivery after the machine was shipped, does not defeat the plaintiff's right to recover his commission thereon. He is not, however, entitled to recover the amount reflected on the "split" sheet, $1,045.35, which represents 75% of the full $1,393.80 commission in accord with the 75%-25% ratio provided by the "split" sheet. The evidence is undisputed that he received $455.00 on the sale and he therefore is entitled only to the difference between $1,045.35 and $455.00 or $590.35. The trial court did not refer to this payment in its "Findings of Fact and Conclusions of Law," determining only that "the Plaintiff was entitled to his commission at the time of the delivery of the machine in Denver."

### III
#### *The American National Bank*

On July 18, 1957, one Progar, at that time a senior salesman working under the plaintiff's supervision, obtained an order from the American National Bank for six accounting machines. Because of a change in management the bank refused to accept the machines. Thereafter, on September 16, 1958, Progar and another salesman, one Forristal, secured an order from the bank for five machines, replacing the original order. On the same date Progar signed a written agreement under the terms of which he relinquished one half of his nine per cent territory commission on the sale to the plaintiff. The plaintiff assumed the responsibility of paying a "point bonus" of $1,111.50 to Forristal. This agreement was approved by Greer, the branch manager, but the defend-

ant's home office was not informed of it. The plaintiff was credited with $4,168.42 on the "split" sheet pursuant to this agreement. After the plaintiff's resignation from the company the machines were paid for and delivered.

Progar left the employ of the defendant at approximately the same time the plaintiff did and thereafter sought to collect the full commission from the company. The company refused to recognize the side agreement and paid Progar the full commission.

The trial court determined that:

"This agreement was made with the knowledge, approval and consent of the branch manager even though *all three parties involved were aware of the fact that such side commission agreements were not to be entered into under the terms of their contracts with the Defendant.*" (Emphasis supplied.)

The court went on to state:

"* * * The Court feels that the Defendant's Denver manager having not followed the terms of the employment contract first in his agreeing to this side agreement and secondly in not submitting the matter to arbitration and not giving the Plaintiff a chance to be present during the conversations and meetings that took place with the other salesman, took action that is not fair and proper and that Plaintiff herein is entitled to the commission *under the outside agreement in this particular transaction.*" (Emphasis supplied.)

Two provisions of the contract of employment are pertinent here. Under one of them any dispute between salesmen "concerning the commission credit which may be properly due" is to be submitted to arbitration and "the decision made in such controversy shall be final." The other provision is a covenant whereby a salesman agrees: "* * * not to share any portion of your compensation with any other employees except those assigned to your supervision and then only to the extent provided by the contracts with us; * * *."

■ It is abundantly clear from the record that Greer

had no actual authority to bind the company by authorizing the agreement, nor did the trial court so find. Nor does any action on the defendant's part indicate that it approved of the agreement; on the contrary, it gave the commission to Progar, thereby disaffirming it. The position we would be compelled to accept if we were to hold that the plaintiff was entitled to recover on this transaction is that Greer in effect had the authority to modify the plaintiff's contract of employment with the defendant. The evidence clearly shows that he had no such actual authority and the rule as stated in 2 C.J.S. *Agency,* Sec. 105 c, p. 1262 is applicable:

"An agent who possesses but limited authority which does not expressly include the power to modify agreements of employment, and who is not held out by the common employer as having any such power, cannot modify the arrangement which the latter makes in hiring a servant or other agent; * * *."

See also, *Lockwood v. Embalmers' Supply Co.,* 233 App. Div. 189, 251 N.Y.S. 321; *Gaddie v. Collins of Kentucky, Inc.,* (Ky. App.) 248 S.W. (2d) 722. In a more general vein, a principal is ordinarily not liable for the independent acts of his agent, done in his own name outside the scope of his employment. *Sparr v. People,* 122 Colo. 35, 219 P. (2d) 317.

Moreover, no question of apparent authority can arise here. In *Restatement (Second), Agency,* § 8 (1958) the following is said:

"Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."

Comment *c.* of the above section states:

*"Belief by third person.* Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. Further, the third person must believe the

agent to be authorized. In this respect apparent authority differs from authority since an agent who is authorized can bind the principal to a transaction with a third person who does not believe the agent to be authorized."

The same text in § 27 states:

"Except for the execution of instruments under seal or for the conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act is created as to a third person by written or spoken words or any other conduct *of the principal* which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." (Emphasis supplied.)

In this case it is clear, and the trial court so found, that all parties to the agreement knew that it was prohibited by their contracts with the defendant company.

In *McClellan v. Morris,* 71 Colo. 304, 206 Pac. 575, this Court stated that if the limitation of an agent's authority is known to the person with whom he deals, the principal is not bound if the agent exceeds his authority. Greer having no authority under any conceivable theory to bind the company, we hold that the plaintiff is not entitled to recover under the agreement.

Nor can he recover because no arbitration proceedings, as such, were held. He did not request an arbitration which is prerequisite to an action upon the contract, *Ezell v. Rocky Mountain Bean & Elevator Co.,* 76 Colo. 409, 232 Pac. 680, and, even if he had and the company had failed or refused to arbitrate the matter, the failure or refusal to arbitrate would not create a liability where none existed under the contract. At best, such a failure or refusal to arbitrate would leave him a right to sue on the contract itself and we have already determined that the defendant company had no liability to the plaintiff on this sale under their contract with him.

The judgment is reversed and the cause remanded with

directions to enter a judgment consistent with the views herein expressed.

MR. CHIEF JUSTICE MCWILLIAMS and MR. JUSTICE SUTTON concur.